**Ed WRIGHT, Appellant,**

v.

**Dorothy M. WRIGHT, Appellee.**

No. 50675.

Court of Appeals of Oklahoma,
Division No. 2.

Feb. 14, 1978.

Released for Publication by Order of
Court of Appeals March 13, 1978.

Roger Hilfiger, Jones, Jones & Hilfiger, Muskogee, for appellant.

Bruce Green, Pearson & Green, Muskogee, for appellee.

BRIGHTMIRE, Judge.

The only complaint plaintiff, Ed Wright, has about the divorce decree rendered below is that the court awarded his former spouse an unfair share of jointly acquired property.

I

When the childless marriage began June 12, 1971 each party was middle-aged and possessed of substantial assets. The woman, Dorothy Wright, owned a house in Cushing, Oklahoma, another in Wagoner, Oklahoma and $85,000 in certificates of deposit—a total of over $115,000 in assets resulting from a previous marriage. Ed Wright, on the other hand owned Snug Harbor Village, Inc.; Snug Harbor Water and Gas Company, Inc.; Ed Wright Construction Company; a home in Wagoner County, Oklahoma; three lots in Patricia Ann Mobile Home Park; and some rental property in Muskogee, Oklahoma. There is no evidence as to the net worth of any of the companies in 1971 but there is evidence that Ed Wright's home was worth some $15,000 and the three mobile home lots were worth $1,000 apiece. About a month before the marriage the parties picked out a mobile home and appropriate furnishings which Ed Wright bought and moved onto the three lots he owned. The home cost about $13,000 and was financed through a bank loan which was paid off by his three companies with money received from the sale of his former home and other properties.

Following the wedding the couple moved into the newly acquired home. During the next several months Ed Wright and his companies improved the property by hauling off rocks, landscaping, building hard surface driveways, walkways, a carport and a patio.

Early in the marriage Ed Wright's company also built a boat dock for Dorothy at her Wagoner lakeside house. Dorothy worked at the Wright company offices but the extent of such service is in sharp dispute. Ed Wright says he not only supported Dorothy during the five years of marriage, but spent over $13,000 taking her on various pleasure trips in an unsuccessful effort to attain connubial "peace."

Dorothy's contribution to the marriage was mainly that of a housewife. She kept the house and cooked the meals. She also took care of Ed for several months after he was released from the hospital in April 1974 where he had remained unconscious after suffering an attack of encephalomyelitis. Before he fully recovered, however, Dorothy "left home again for the fourth time . . .."

For about a year prior to the divorce Ed said Dorothy had been "working me for a new car and I refused to buy it because she had been leaving home . . . [and] going back to her home . . . ." Finally, though, he gave in and on August 20, 1976 bought her a new Oldsmobile at a cost of $7,446. "I borrowed every penny of it, including the taxes, insurance and everything, from the Commercial Bank," said Ed. "[I]t wasn't very long after that till she took off with the car. . . . Loaded her clothes in the car and took off . . . on Saturday and . . . I had all of it I wanted so I went down and filed for divorce Monday morning by ten o'clock."

## II

In January 1977 the trial court, after hearing the parties' evidence, distributed the property owned by them as follows.

Dorothy Wright was given the new Oldsmobile "free and clear," the boat dock built near her house, and a $10,000 judgment against Ed Wright representing what the court said was "one-half the value of the house trailer and improvements, excepting the lots." In addition the trial judge set over to her exclusive title to her premarriage separate property and ordered Ed to repay $11,000 he borrowed from her earlier.

Ed Wright's separate property rights in his corporations and other property acquired prior to the marriage were confirmed and he was "awarded the house trailer and three lots" and his 1976 Ford automobile which he had bought not long after he "totaled out" an older car he owned.

To recapitulate, the court restored to "each party . . . property which they had prior to their marriage" and in addition, awarded Dorothy a judgment against Ed for about $17,000 ($10,000 cash plus ordering him to pay off the $7,000 Oldsmobile loan balance). It is this amount Ed Wright objects to as being without a legal or equitable foundation.

## III

Although not entirely clear it is fairly deducible from the contents of his decree that the trial judge treated the mobile home of the parties (save for the three lots), the 1976 Oldsmobile, and perhaps also the postnuptial acquisition of certain heavy equipment by the Ed Wright Construction Company as jointly acquired property, and effected a division of it by means of the money judgment. The trouble is that we can find no evidentiary foundation for determining with certainty whether the parties accumulated any joint assets during the marriage much less the extent of them. Obscuring the picture, of course, is the fact that each party brought to the short marriage substantial separate property.

Take the mobile home, for instance. Admittedly it was purchased by Ed Wright before the parties were married and parked on three lots owned by him. Purchase-money indebtedness against it was generated by a company which was the separate property of Ed Wright. Later improvements of the property were made by Ed Wright and his companies. The court placed a $23,000 value on the property and deducted $3,000—the value of the lots three years earlier—and evidently considered the remaining $20,000 as a jointly acquired asset of the parties. This is difficult to follow

in view of the fact that (1) the lots likely appreciated during the five-year marriage and (2) Ed Wright bought the $13,000 trailer before the marriage with borrowed money repaid out of his separate resources. If indeed the mobile cottage did appreciate in value, most of the increase, from all that appears in the record, was due to inflation rather than the parties' joint efforts. Certainly no one has argued that the increase in value of separate real estate of either party should be divided as jointly acquired property. And finally, if we consider the difference between the $16,000 cost of the mobile home and lots ($13,000 plus $3,000) and the $23,000 value placed on them by the court as a jointly acquired asset there still is no more than $7,000 to divide.

The new Oldsmobile presents yet a different situation. The trial court evidently treated acquisition of title to the car (which incidently was placed in the name of Ed Wright Construction Company) as an instant joint asset creation equal to its full value. This, of course, cannot be under the circumstances of the case. Had the parties paid cash for the car there would have been merely a conversion of assets with perhaps an immediate loss due to depreciation of the new car. Moreover the cash converted would have had to come either from his or her separate estate, there being no evidence of any jointly acquired cash on hand. As it turned out the car was 100 percent financed by a bank. At the time of trial there was no equity in the car which could be owned by either party jointly or severally.

And so the conclusion we reach is that by straining the record inferentially to the utmost one can find jointly accumulated equity of no more than $7,000—the equity in the mobile home property we mentioned earlier. True, Dorothy points to a backhoe, front-end loader, four cars and one or two pickups acquired by the construction company during the marriage, but here again such acquisitions in themselves do not alter the net worth of either the construction company or the parties. Undoubtedly Dorothy felt she was entitled to share in any increase in value experienced by the companies because she made an effort to play up the amount of work she did for them. To succeed in this regard she would have to show two things: (1) that the net worth of the companies increased during the marriage; and (2) such increase resulted in substantial part from her efforts. *Longmire v. Longmire*, Okl., 376 P.2d 273 (1962).

Here the record discloses first of all that no attempt was made to show the net worth of the companies—nor the value of Ed Wright's interest in them—either as of June 12, 1971 or at the time this divorce action was filed. Under these circumstances there exists no way to determine whether the companies, and more particularly of Ed Wright's interest in them, increased in value. Absent such information it is immaterial how much work Dorothy did for one of the companies.

We hold that the trial court's division of the marital estate is premised on factual findings or assumptions clearly contrary to the weight of the evidence and consequently is unfair and inequitable. The decree is therefore modified as follows:

(1) That portion of the February 24, 1977 decree which orders that "plaintiff shall pay the balance of any lien or mortgage against said automobile" is deleted therefrom and defendant is ordered to pay off the mortgage indebtedness against the 1976 Oldsmobile; (2) the order requiring plaintiff to pay defendant "$10,000 for her share of the home" is reduced to $3,500 against which plaintiff is entitled to a credit of $1,500 for the boat dock awarded to defendant and the amount of payments he or his companies have made on the 1976 Oldsmobile since February 24, 1977.

The decree is in all other respects affirmed.

NEPTUNE, P. J., and BACON, J., concur.